Glenn ELLENDER, Plaintiff–Appellant,

v.

KIVA CONSTRUCTION & ENGINEERING, INC., et al.,
Defendants–Appellees.

No. 90–3179
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Aug. 22, 1990.

Leon A. Aucoin and Thomas J. Eppling, Aucoin, Unland & Eppling, Metairie, La., for plaintiff-appellant.

Esmond Phelps Gay, Christovich & Kearney, New Orleans, La., for defendants-appellees.

Before JOLLY, HIGGINBOTHAM, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Glenn Ellender appeals from a summary judgment which determined as a matter of law that he was not a Jones Act seamen because the construction platform upon which he worked was not a "vessel." According to our precedents, we must affirm.

For several weeks before his accident, Glenn Ellender worked for Kiva Construction & Engineering Inc. (Kiva) as a contract laborer and then as a rigger. On his first assignment, he helped Kiva lay pipelines and perform maintenance work on an existing oil platform in Chandeleur Sound. Although Kiva used its own spud barge, the **KC & E # 1**, and its 50 ton crane to complete this job, Ellender remained predominantly on board the work platform, entering the barge only to retrieve tools and supplies. Ellender's duties included sand blasting, pipe fitting, pipe threading and painting. After this first job, Ellender returned to Kiva's shipyard, where he cleaned-up after the operation and readied the tools for the next assignment.

One week later, Kiva assigned Ellender to another crew working in Chandeleur Sound. This job involved laying flow lines and constructing a platform containing oil production equipment and tanks to store condensate. For this job, Kiva classified Ellender as a "rigger," although he really functioned as an all-purpose laborer, performing whatever tasks his supervisor instructed him to perform.

Since Kiva was constructing a new 40' by 60' platform, rather than maintaining an old one, Kiva needed to provide the work space for its employees. Furthermore, construction of this surface required Kiva to drive wooden support piles into the ground using a 110 ton crane. Because the **KC & E # 1** could not adequately brace this crane, Kiva leased a spud barge, **ATHENA 3**, from another construction company. Kiva tied three other 30' by 90' general purposes barges to this spud barge and used the four-barge surface as a work station. The three all-purpose barges contained galvanized tanks, pilings, equipment, supplies, and living quarters for the workers. The **ATHENA 3** provided the main working platform.

None of these barges were self-propelled. Kiva used tugboats to maneuver the facility into place at the construction site, and then anchored the entire configuration with the spuds on the **ATHENA 3**. The tug boat and an additional crew boat remained anchored with the barges during the operation. Kiva used the crew boat to

retrieve supplies from the shore and to transport crewmembers to land when necessary.

The laborers began platform construction by driving the first row of pilings. When the workmen finished the first row, the machine operator retracted the spuds and the tugboat moved the barges several feet to make room for the next row. The tugs also moved the barges longer distances if inclement weather threatened. With the exception of these two instances, the barges remained stationary during the construction project.

Ellender's only duties on this project involved pile driving, and he performed most of this work from the spud barge. Occasionally, he used equipment or supplies from one of the other barges. For the most part, he hooked up the crane cables to the pilings so that the crane operator could place the pilings in the water and then hammer them into place. Ellender never operated the tugboat, navigated the barges or lifted and lowered the spuds. He did not possess a seaman's license, and Kiva never assigned him permanently to work on any particular barge.

Ellender was injured on June 18, 1988. He had just rigged the leads around a piling, when the crane operator lifted the piling off the barge and the leads slipped. The piling came to rest on a rung of the lead ladder. Ellender climbed the lead ladder to refasten the chains so that the crane operator could move the piling. As Ellender started back down the ladder, the leads shifted and the piling came down on his foot, shattering three of his toes. Ellender continued down the ladder. When he reached the bottom, crewmembers iced the injury, and then placed Ellender aboard the tugboat which took him to a helipad. The Coast Guard met him there and airlifted him to the hospital.

Doctors amputated all three of his toes. Ellender missed three months of work, but he then returned to work at Kiva. Kiva terminated him three weeks later for lack of diligence. However, Ellender has found and maintained other employment despite his injury. Pursuant to the Longshoreman's and Harbor Worker's Compensation Act (LHWCA), Liberty Mutual Insurance Company paid Ellender's medical expenses plus $290 per week from the date of the accident until December 8, 1988. After that, he received a lump sum payment of $27,000.

Ellender initiated this Jones Act suit against Kiva Construction & Engineering Inc., and its insurer, Liberty Mutual Insurance Company, on June 15, 1989. 46 U.S.C. App. § 688. Based upon the depositions of Glenn Ellender and Kiva's President Joseph McDermott, Kiva moved for summary judgment on the ground that the **ATHENA 3** was not a "vessel" for Jones Act purposes. The district court agreed, and Ellender appeals that determination.

## DISCUSSION

■ Before Ellender can receive compensation under the Jones Act as a seamen, he must demonstrate:

(1) that he was assigned permanently to a "vessel", which may include special purpose structures not usually employed as a means of transport but designed to float on water; and

(2) that the capacity in which he was employed or the duties which he performed contributed to the function of the vessel.

*Waguespack v. Aetna Life & Casualty Co.*, 795 F.2d 523, 525 (5th Cir.1986), *cert. denied* 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 163 (1987), quoting *Offshore Co. v. Robison*, 266 F.2d 769, 777 (5th Cir.1959); *Guidry v. South Louisiana Contractors Inc.*, 614 F.2d 447, 452 (5th Cir.1980). The question of whether a particular person is a seaman is ordinarily a question of fact for the jury. *Waguespack*, 795 F.2d at 526; *Watkins v. Pentzien, Inc.*, 660 F.2d 604, 606 (5th Cir.1981), *cert. denied* 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 467 (1982).

However, summary judgment may be appropriate where "the facts establish [the lack of seamen status] beyond question as a matter of law" and no reasonable evidentiary basis exists to support a jury finding that the injured person is a seaman. *Bar-*

*rett v. Chevron U.S.A., Inc.*, 781 F.2d 1067, 1074 (5th Cir.1986); *Bernard v. Binnings Construction Co. Inc.*, 741 F.2d 824, 828 (5th Cir.1984); *Watkins*, 660 F.2d at 606. If, as in this case, the facts underlying summary judgment are undisputed, our task is "to review the facts to determine whether reasonable persons might draw conflicting inferences." *Bernard*, 741 F.2d at 828. Where only one reasonable inference exists, we must affirm the summary judgment as a matter of law.

 In order to qualify as a Jones Act seaman, Ellender must have worked on a "vessel." The Jones Act does not define the term "vessel," and we have repeatedly held that the term is incapable of precise definition. *Bernard*, 741 F.2d at 829. However, we may rely on the purpose for which the craft was built and the business in which it was engaged to guide our inquiry. *Bernard*, 741 F.2d at 829; *Watkins*, 660 F.2d at 607, n. 1. Other factors like the structure's size, its ability to float, its permanent fixation to the shore or the bottom, and its movement or its ability to move across navigable waters are inconclusive. *Bernard*, 741 F.2d at 829; *Cook v. Belden Concrete Products, Inc.*, 472 F.2d 999, 1000–1001 (5th Cir.), *cert. denied*, 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973). Further, structures whose primary function is non-navigational or non-transportational may still qualify as vessels, if the structure was involved in navigation at the time of the injury. *Bernard*, 741 F.2d at 829; *Cook*, 472 F.2d at 1002.

Based upon these established principles, the Fifth Circuit has routinely held, as a matter of law, that neither a single construction barge nor several barges strapped together to form a floating construction platform constitute "vessels" under the Jones Act. *See Waguespack*, 795 F.2d at 526. We summarized the rationale behind this decision in *Bernard v. Bin-*

*nings Construction Co., Inc.*, 741 F.2d at 831:

A review of these cases indicates three factors common to them: (1) the structures involved were constructed and used primarily as. work platforms; (2) they were moored or otherwise secured at the time of the accident; and (3) although they were capable of movement and were sometimes moved across navigable waters. in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose of serving as work platforms.

*See Daniel v. Ergon, Inc.*, 892 F.2d 403, 407 (5th Cir.1990). Thus, where a barge was not designed or used to transport passengers, cargo, or equipment from place to place across navigable waters, where the barge required tugboats or other vessels to move it, and where the barge remained virtually stationary during any particular project, the barge would not qualify as a Jones Act vessel. *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290 (5th Cir. 1990); *Ducrepont v. Baton Rouge Marine Enterprises Inc.*, 877 F.2d 393, 395 (5th Cir.1989) (barge refurbishing craft is a work platform and not a Jones Act vessel); *Cook*, 472 F.2d at 1000–1001.

This circuit's decisions in *Leonard v. Exxon Corp.*, 581 F.2d 522 (5th Cir.1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979) and *Watkins v. Pentzien, Inc.*, 660 F.2d at 604, and the 11th Circuit's decision in *Hurst v. Pilings & Structures, Inc.*, 896 F.2d 504 (11th Cir. 1990) are particularly instructive.[1] In *Leonard*, plaintiff worked on a "platform" made of four flat-deck barges. Three of these barges were lashed end to end, while the fourth served as an access ramp and a crane platform. The barges were moved by means of an external power source, and secured in the Mississippi River via cables connected to the shore. Exxon periodically

---

**1.** The Eleventh. Circuit's decision in *Hurst v. Pilings & Structures, Inc.*, 896 F.2d 504 (11th Cir.1990) is especially persuasive out-of-circuit precedent since that court was interpreting Fifth Circuit cases including *Bernard v. Binnings Construction Co., Inc.*, 741 F.2d 824, 831 (5th Cir.

1984), *Watkins v. Pentzien, Inc.*, 660 F.2d 604 (5th Cir.1981), *Leonard v. Exxon Corp.*, 581 F.2d 522 (5th Cir.1978), and *Cook v. Belden Concrete Products, Inc.*, 472 F.2d 999, 1000–1001 (5th Cir. 1973).

moved the assembly in order to permit the crane to perform its tasks. After reviewing this configuration, the court concluded that the platform was not a Jones Act vessel as a matter of law because it "was neither designed for navigation nor engaged in navigation at the time of the accident." *Leonard*, 581 F.2d at 524.

A similar situation existed in *Watkins*, 660 F.2d at 604. There, plaintiff welded together sections of a concrete-coated pipeline on board a construction platform made out of two barges that were lashed together. After connecting the barges, Pentzien, Inc. towed the platform to the Sabine river and fastened it to the river bottom using spuds. Pentzien periodically moved the assembly in order to drop the welded pipeline into the marsh. The *Watkins* court found this case factually indistinguishable from *Leonard*:

> Both [barge assemblies] were used to weld sections of pipe together. Both consisted of barges fastened together. In neither case could the barges move under their own power. Both platforms had to be moved from place to place by a tug. In both cases, the platforms were affixed 'more or less permanently.' In the instant case, the barges were held in place near the bank of the Sabine River by the spuds; in Leonard they were attached close to the banks of the Mississippi by steel cables.

*Id.* at 607. As a result, the court concluded that "Watkins [was] not covered by the Jones Act as the structure on which he was injured was not a vessel in navigation." *Id.*

Relying on these two precedents, the 11th Circuit reached the same result in *Hurst v. Pilings & Structures, Inc.*, 896 F.2d at 504. There, a diver was injured when he attempted to climb out of the water onto his employer's spud barge. The court concluded that the spud barge was not a vessel as a matter of law because the barge had no means of self-propulsion or navigation and because:

> [It] was constructed for the purpose of serving as a work platform ... and ... it was engaged as a work platform at the

time of Hurst's alleged injury.... The barge was secured at least temporarily to the waterway floor ..., and the barge's only transport function—carrying its own push boat, smaller barges, *and crane*—was incidental to its primary purpose of serving as a work platform.

*Id.* at 506 (emphasis added). Thus, concluded the court, the spud barge was not a vessel in navigation.

■ In line with these three precedents, the four-barge platform assembly which included the **ATHENA 3** clearly was not a Jones Act vessel at the time that Ellender suffered his accident. Like the craft in *Watkins* and *Hurst*, the **ATHENA 3** was a spud barge, built primarily to serve as a work platform. In this particular case, it supported a large mobile crane and other work equipment needed to build the oil platform. However, it provided these "transportation functions" incidentally to its other uses. As Joseph McDermott stressed repeatedly in his deposition, "The barge ... provides whatever you need in the way of a platform to work off of and whatever you need in the way of a tool. The barge did not perform any other function to the job except for maybe a temporary storage of material." Kiva used a crewboat or the tugboat which it kept at the work site to transport crewmembers back to shore and to retrieve other supplies.

The barges had no independent means of navigation. Kiva moved them into position using tugboats and periodically repositioned them to facilitate pile driving operations. However, like the *Watkins* and *Hurst* craft, Kiva affixed this assembly 'more or less permanently' to the bottom of the sound using the spuds. At the time of Ellender's accident, the assembly was securely anchored in calm waters. Given the striking similarities between this case and prior precedents, it appears as a matter of law that the **ATHENA 3** was not a Jones Act vessel.

Ellender presents several reasons why he is not bound by these prior cases. First, he explains, unlike those precedents, the four-barge surface on which he worked included

living quarters for the crew, suggesting that it was built as a sea-going vessel rather than as a stationary platform. We have already rejected a similar argument in *Watkins*, 660 F.2d at 607, n. 1. There, the plaintiff contended that the platform on which he worked should be considered a vessel because his employer used a tugboat to transport him to that platform on a daily basis. We disagreed, explaining that the inquiry should focus on "the purpose for which the craft was constructed and the business in which it is engaged" rather than on the mode of access to the platform utilized by the employer. *See also Gremillion*, 904 F.2d at 290.

The same reasoning should apply here. The fact that the employer chose to provide *minimal* living quarters for the crew rather than to transport the crew on a daily basis does not alter the platform's function. Moreover, Kiva made a crewboat available to take workers back and forth to its facility when necessary. Distinguishing this case from *Watkins* on the basis of living quarters would elevate form over substance.

Finally, Ellender argues that this Court's decision in *Brunet v. Boh Brothers Construction Co.*, 715 F.2d 196 (5th Cir.1983), should control his case. In *Brunet*, plaintiff was injured aboard a pile driving barge consisting of "several interlocking flexifloat platforms" which carried a 150 ton crane. The court held that summary judgment was inappropriate on the question whether or not that craft was a vessel because:

> The Barge 4000 Ringer ... lacks the Cook similarity to dry docks or construction platforms. The barge by necessity *is designed to transport* a pile-driving crane across navigable waters to jobsites that cannot be reached by land-based pile drivers....
>
> While we agree that the barge was used more often to support the crane than to transport it, we cannot agree that the transportation function was so "incidental" as to warrant a conclusion that the barge was not a vessel as a matter of law....

> The Barge 4000 Ringer was not constructed to serve ... as a 'tool' to be used in driving piles.... [T]he barge was designed both to support the crane *and to transport it on a fairly regular basis from one jobsite to another.*

*Id.* at 198–199. (emphasis added). See also *Colomb v. Texaco Inc.*, 736 F.2d 218 (5th Cir.1984) (highly mobile drill barge was a vessel in navigation).

The factors supporting the decision in Brunet do not apply here. While Kiva used the four-barge platform to drive piles for this particular construction project, Kiva used similar assemblies on other projects to lay pipelines and to do other construction work. Where necessary, the assembly would support a mobile crane. However, it is clear that, unlike the *Brunet* barge, this barge assembly was not solely designed to transport a crane from jobsite to jobsite, since *Kiva* owned the mobile crane but *rented* the **ATHENA 3** from another construction company.

For this project, Kiva did require the larger barge to safely support the 110 ton crane used to construct the oil platform. However, Ellender does not argue that Kiva rented this barge continuously over a long period of time to transport this crane around Louisiana waters. Rather, as Joseph McDermott emphasized in his deposition, this barge assembly served almost exclusively as a construction platform to provide the tools needed for this particular project. Under these circumstances we regard as controlling the other Fifth Circuit precedents and conclude, as a matter of law, that Kiva's construction platform was not a Jones Act vessel.

We AFFIRM the district court's summary judgment.